IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| THE ESTATE OF PATRICK HERINGER, DECEASED<br>By: Keith Mellon<br>Administrator, Estate of Patrick Heringer<br>c/o The McMurtry Law Firm, PLLC<br>405 Garrard Street<br>Suite 204<br>Covington, KY 41011 | : | **Case No. 1:26-cv-00554** |
| | : | **Judge** _____ |
| | : | **COMPLAINT** |
| | : | **WITH JURY DEMAND** |
| and | : | |
| SARAH HERINGER<br>c/o The McMurtry Law Firm, PLLC<br>405 Garrard Street<br>Suite 204<br>Covington, KY 41011 | : | |
| **Plaintiffs,** | : | |
| vs. | : | |
| CITY OF CINCINNATI<br>801 Plum Street<br>Cincinnati, Ohio 45202 | : | |
| and | : | |
| OFFICER NELSON A. GUSTAVE<br>c/o City of Cincinnati<br>801 Plum Street<br>Cincinnati, OH 45202 | : | |
| and | : | |
| OFFICER NICHOLAS S. VENTRE<br>c/o City of Cincinnati<br>801 Plum Street<br>Cincinnati, OH 45202 | : | |
| and | : | |

| | |
|---|---|
| UNKNOWN OFFICER INVOLVED IN JUNE 3, 2025 INCIDENT c/o City of Cincinnati 801 Plum Street Cincinnati, OH 45202 | : : : : : : |
| and | : : |
| UNKNOWN OFFICER INVOLVED IN JUNE 3, 2025 INCIDENT c/o City of Cincinnati 801 Plum Street Cincinnati, OH 45202 | : : : : : : |

**Defendants.**

Plaintiffs the Estate of Patrick Heringer, deceased (the "Estate" and "Patrick"), Sarah Heringer (hereinafter "Sarah" or "Mrs. Heringer") and by and through their undersigned counsel, allege for their Verified Complaint against Defendants as follows:

## I. NATURE OF THE ACTION

1. Federal law authorizes a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution" under color of state law. 42 U.S.C. § 1983. A city police department may be held liable under 42 U.S.C. §1983 for the murder of a citizen if the conditions in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) are met. Monell requires proof of a <u>policy, custom, or practice</u> that was the moving force of the plaintiff's injury.

2. The Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law," U.S. Const. Amend. XIV, and the Fifth Amendment imposes the same constraint on federal action, U.S. Const. Amend. V. The Estate and Sarah Heringer assert that the actions of the City and the individually named police officers deprived them of these rights. This lawsuit asserts a constitutional violation as outlined below.

2

3. The City of Cincinnati's customs and practices by which it governed its police department, the police department's customs and practices, and the actions of the individual officers as described below caused Patrick's death and Sarah's injuries.

4. Mayor Aftab Pureval ("Mayor Pureval"), City Manager Sheryl Long ("City Manager Long"), and the City of Cincinnati (the "City") have induced the Cincinnati Police Department ("CPD") and individual Officers to under-police, under-investigate, and under-report crime in Cincinnati. These policies, customs and practices allowed Cincinnati to appear to be a lower crime city than it actually is. This directly benefits the City's leadership by allowing it to appear to govern a safe city, gain political support for the City's policies, and to spend less than it might otherwise on policing allowing the City to direct those monies to other political priorities.

5. These policies, customs and practices were the reason that Patrick's murderer, Mordecia Black ("Black"), was not arrested despite repeated encounters with Cincinnati police. The City's unwritten custom and practice to under-police, under-investigate, and under-report crime in Cincinnati is the direct and proximate cause of Patrick's death and Sarah's injuries.

6. The City's unwritten customs and practices led directly to its failure to follow its written policies and procedures. Had the City followed its written, publicly stated policies, instead of its unwritten policy, Black would have been arrested before he murdered Patrick and attempted to rape Sarah.

7. Conversely, the City failed to train its polices officers in its official written policies, opting instead to follow the unwritten customs and practices. This conduct amounts to a failure to train its offers and a showing of deliberate indifference to that training.

8. Leaders within the CPD are aware of this custom and practice. Through deliberate indifference, CPD leaders and police officers have allowed this custom and practice to continue.

**Patrick and Sarah Heringer**

9. Patrick grew up in Campbell County, Kentucky surrounded by a loving family. As an adult, he chose to enter the Army.

10. Patrick was a decorated Army Captain, who served two tours overseas. He served our Nation honorably in both Iraq and Afghanistan. While doing so, he risked his life in combat to preserve our way of life and to protect Americans from foreign adversaries.

11. While in the Army, Patrick was awarded two Bronze Stars, an Iraq Campaign Medal, an Afghanistan Campaign Medal, a National Defense Service Medal, a Global War on Terror Service Medal, a NATO Medal, two Overseas Service Ribbons, a Combat Action Badge, and Air Assault Wings. Patrick's life epitomized one of service and bravery.

12. Patrick's men loved him and risked their lives at his command. Patrick valued and protected his soldiers' lives. This tendency to valor led Patrick to protect his wife from the intruder, Black, in the early hours of June 4, 2025.

13. After Patrick left the Army, he met Sarah. They married and together built a life in Cincinnati, as residents and business owners.

14. Patrick and Sarah founded the gym, Findlay Movement. This successful Over-the-Rhine gym served a broad community of fitness minded people, all of whom considered Patrick and Sarah personal friends. Patrick was a natural leader both in combat and in business. Patrick and Sarah were established and respected members of the Over-the-Rhine community.

**Mordecia Black**

15. Black is an ultra-violent felon and murderer.

16. In the months before he murdered Patrick, Black was released from a nine-and-a-half-year long prison sentence in January of 2025. By February, he had cut off his ankle monitor and absconded his post-release supervision. The Adult Parole Authority issued a warrant for Black's arrest.

17. Between March and June of 2025, CPD Officers responded to three separate crime scenes involving Black.[1] In April, they were told by Black's girlfriend that Black had been living at 1713/1715 Vine Street (the "Vine Street Address").

18. CPD policy required the responding Officers to update Black's last known address to the Vine Street Address in their Records Management System ("RMS"). This policy exists to ensure that the Warrant Service Task Force would know to search for Black at the Vine Street Address. Officers did not timely associate Black with the Vine Street Address in the CPD RMS.

19. CPD never attempted to serve Black at the Vine Street address. They never even looked for him there, despite issuing another warrant for Black's arrest in May, this time for a burglary on Straight Street.

20. As a part of its custom and practice to under-police, under-investigate, and under-report crime in Cincinnati, the police department never attempted to locate Black, a known ultra-violent criminal.

21. The result of the City's under-reporting, under-policing, and under-investigating of Black's crimes was foreseeable: Black continued to roam free, committing crimes.

22. Sarah and the Estate maintain an action for money damages for this horrible, preventable murder, and the political decision to under-report, under-police, and under-investigate crime that allowed it to occur. Mordecia Black may have held the knife, but, in order to artificially reduce the number of violent crimes reported in the City, the City affirmatively *chose* to let him roam free until he committed the murder.

23. The City of Cincinnati is liable to Sarah and the Estate for its intentional under-policing, under-reporting, and under-investigating of crime in the City, in direct contravention of the Cincinnati Police Department's policies and procedures.

---

[1]CPD responded to a burglary at the Vine Street Address on April 6, 2025; a burglary on Straight Street on May 15, 2025; and an incident at the Hyatt Hotel on June 3, 2025, during which Black was the apparent victim of felony mace assault and theft offenses, reported by a Hyatt employee.

5

24. Officers Nicholas S. Ventre, Nelson A. Gustave, and the City of Cincinnati are liable for their decision to implement the custom and practice of under-policing, under-reporting, and under-investigating crime in the City, and their decision not to follow established policies and procedures, which in combination was a direct and proximate cause of Patrick's death and Sarah's injuries.

25. Ventre and Gustave acted under color law when they chose not to follow clearly established laws regarding reporting crimes.

26. Two currently unknown officers involved in the June 3, 2025 incident are liable for their decision to implement the custom and practice of under-policing, under-reporting, and under-investigating crime in the City, and their decision not to follow established policies and procedures, which in combination was a direct and proximate cause of Patrick's death and Sarah's injuries.

27. The officers involved in the June 3, 2025 incident acted under color law when they chose not to follow clearly established laws regarding reporting crimes.

## II. PARTIES, JURISDICTION, AND VENUE

28. Plaintiff Sarah Heringer is the widow of Patrick Heringer. She brings this action on her own behalf. Keith Mellon is the Administrator of Patrick's Estate. He brings this action on behalf of the Estate.

29. The City of Cincinnati is a unit of local government organized under the laws of the State of Ohio. The City of Cincinnati is a subdivision under R.C. § 128.01(M).

30. Defendant Nicholas S. Ventre was at all times relevant to this complaint an employee of the City of Cincinnati. His sole or principal employment with the City was as a Police Officer. He is sued in his individual capacity arising from actions he took to further Cincinnati's custom and practice of under-policing, under-reporting, and under-investigating crime in the City, and his decision not to follow established policies and procedures, which individually and in combination was a direct and proximate cause of Patrick's death and Sarah's injuries.

6

31.     Defendant Nelson A. Gustave was at all times relevant to this complaint an employee of the City of Cincinnati. His sole or principal employment with the City was as a Police Officer. He is sued in his individual capacity arising from actions he took to further Cincinnati's custom and practice of under-policing, under-reporting, and under-investigating crime in the City, and his decision not to follow established policies and procedures, which individually and in combination was a direct and proximate cause of Patrick's death.

32.     Unidentified officers involved in the June 3, 2025 incident were at all times relevant to this complaint employees of the City of Cincinnati. Their sole or principal employment with the City was as Police Officers. They are sued in their individual capacity arising from actions they took to further Cincinnati's custom and practice of under-policing, under-reporting, and under-investigating crime in the City, and their decision not to follow established policies and procedures, which individually and in combination was a direct and proximate cause of Patrick's death.

33.     This Court has subject-matter jurisdiction over Plaintiffs' federal civil rights claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside, and a substantial part of the events giving rise to the claims occurred, in Hamilton County, Ohio, which lies within the Southern District of Ohio, Western Division.

### III. FACTUAL BACKGROUND

34.     In March of 2016, Black was convicted of Riot and Felonious Assault for orchestrating the brutal assault of Christopher McKnight at Fountain Square in Cincinnati, Ohio.[2]

35.     McKnight was a stranger to Black, and the motive for the assault remains unclear to this day. It was suspected at the time that Black's crime was a racially motivated hate crime.

---

[2] *State v. Black*, Hamilton County Case Number CRB-1503614(C)

36. Due to his extensive criminal record at the time of that assault, Black was sentenced to nine and a half years in prison. He served the entirety of his statutory sentence.

37. In January of 2025, Black was released from prison and subjected to post-incarceration supervision by the Adult Parole Authority.

38. Black was released to a halfway house named the Talbert House in Cincinnati, Ohio, and required to report to a parole officer.

39. In February of 2025, Black absconded from his supervision by cutting off his ankle monitor. Immediately, a warrant was entered into the National Crime Information Center ("NCIC") for his arrest.

40. On April 6, 2025, Cincinnati Police Officers Nicholas S. Ventre and Nelson A. Gustave responded to a reported domestic violence call at the Vine Street Address.

41. The April 6, 2025 complainant reported that she was Black's girlfriend. She reported that Black had been living at the residence, but that she had kicked Black out of the residence earlier in the day.

42. Despite being kicked out, Black had broken back into the residence. Black's girlfriend relayed facts to Officers Ventre and Gustave that indicated she feared for her physical safety. A report of Domestic Violence would have obligated the officers to immediately search for Black and arrest him. The allegation that Black was physically threatening to Black's girlfriend made it mandatory for Officers Ventre and Gustave to report the incident as "Domestic Violence." Instead, Officers Ventre and Gustave minimized the situation.

43. The incident was instead reported as a "Domestic Disturbance." Thus, Officers Ventre and Gustave were relieved of actually doing anything.

44. Officers Ventre and Gustave acted in a wanton and reckless manner by ignoring the threat Black posed, ignoring the violence Black committed against another, ignoring the NCIC warrant, and by exceeding the discretion granted to them by Cincinnati Police Department policy by downgrading the report from a "Domestic Violence" call to a "Domestic

Disturbance." They acted with reckless disregard for the foreseeable consequences of their actions.

45. This conduct is consistent with the City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City.

46. CPD policy requires that officers responding to a crime scene to check for outstanding arrest warrants for the parties involved in the reported crime.

47. Upon information and belief, Black's NCIC warrant was still active on April 6, 2025.

48. NCIC warrants are readily visible and discoverable to Cincinnati Police Officers.

49. NCIC warrants are readily visible and discoverable to Cincinnati Dispatchers.

50. Despite believing Black to be residing at the residence, and despite having actual knowledge of Black's outstanding arrest warrant, Officers Ventre and Gustave did not associate Black with the Vine Street Address in the Cincinnati RMS.

51. This conduct is consistent with the City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City.

52. This necessarily means that no attempts were ever made to serve Black's arrest warrant at the Vine Street Address.

53. On May 15, 2025, Black was implicated in another home invasion, this time at 650 Straight Street in Cincinnati Ohio.

54. Police responded to that reported home invasion and determined that they would charge Black with Burglary for that incident.

55. However, Black's address is listed on the May 15, 2025 police report as 50 Topridge Place, Cincinnati, Ohio 45232, despite his most recent Police contact being at the Vine Street Address, and despite the determination of Officers Ventre and Gustave that Black was residing at the Vine Street Address.

56. On the evening of June 3, 2025, less than twelve hours before he murdered Patrick, Black was again the subject of a CPD response — this time at the Hyatt Hotel in downtown Cincinnati.

57. A Hyatt employee, a third-party witness independent of Black, called 911 to report that Black had been maced in the face and had his backpack stolen. Causing or attempting to cause physical harm to another by means of mace constitutes felonious assault under R.C. § 2903.11. A theft offense accompanied by the infliction, attempt, or threat of physical harm constitutes robbery under R.C. § 2911.02. Both are felony offenses.

58. CPD Officers responded to the Hyatt and made direct, in-person contact with Black, who was the apparent victim of those felony offenses. Visible evidence of the offenses, including, upon information and belief, mace residue and physical effects of the chemical irritant on Black's face, was apparent to the responding Officers.

59. When questioned by the responding Officers, Black provided a false name and stated that he did not wish to press charges.

60. Notwithstanding the third-party report, the visible evidence of felony crimes, and Black's provision of a false name, the responding Officers did not generate any official incident report, did not verify Black's identity, did not run his information through any law-enforcement database, and did not investigate the apparent felony offenses.

61. This conduct violated R.C. § 2921.22, which requires the reporting of known felonies and serious physical harm; R.C. § 2935.03, which obligates peace officers to arrest persons who have committed felonies in their presence or for whom probable cause of a felony exists; and Cincinnati Police Department Procedure 12.400, which requires Officers to "complete an accurate and thorough report of all complaints of criminal activity, regardless of the victim's desire to prosecute."

62. Body-worn camera footage of the responding Officers' interaction with Black is preserved and is currently held in the discovery file of the pending criminal case against Black.

63. Had the responding Officers verified Black's identity — a routine step required by department policy — they would have immediately discovered Black's outstanding NCIC

parole-violation warrant. Black would have been arrested on the night of June 3, 2025, and Patrick Heringer would not have been murdered.

64. Failure to follow the applicable law and procedures associated with this incident is consistent with the City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City.

65. As well, this conduct is wanton and reckless. These officers knew they were obligated by law to investigate this crime but chose not to. Had they done what was mandated by law and regulation, Patrick would be alive and Sarah would never have suffered an attempted rape.

66. At approximately 4:00 a.m. on Wednesday, June 4, 2025, Black was again at the Vine Street Address, and the resident called to report another burglary.

67. Black stole clothes, shoes, and a kitchen knife from the residence.

68. Black is captured on video fleeing the Vine Street Address and walking approximately three tenths of a mile to Patrick and Sarah Heringers' home on East McMicken Avenue. It took Black less than 5 minutes to walk to the Heringers' home.

**Black Murders Patrick and Attempts to Rape Sarah**

69. Once there, he broke in.

70. Patrick awoke to the noise of an intruder in his home. He went to investigate. Black surprised Patrick and attacked him with the stolen kitchen knife.

71. Black stabbed Patrick seven times.

72. Black then ventured upstairs to Patrick and Sarah's bedroom where he assaulted and attempted to rape Sarah. But Sarah fought back and Black left the home.

73. Sarah called 911. The dispatcher asked for Black's gender. The dispatcher asked for Black's race. The dispatcher asked what Black was wearing, whether Black was still in the house, and how tall Black was. During the entire call, Patrick was bleeding to death on the floor.

11

74. The dispatcher did not tell Sarah how to stop Patrick's bleeding until three minutes into the phone call.

75. CPD Officers arrived on the scene a few minutes later, along with an ambulance.

76. Patrick was loaded into the ambulance by the first responders, and Sarah attempted to get into the ambulance.

77. CPD Officers arrested Sarah and told her she could not accompany Patrick to the Hospital.

78. Sarah was transported to CPD headquarters for questioning. Sarah asked repeatedly whether Patrick was ok, and CPD staff lied to her, informing her that Patrick was stable.

79. This lie accomplished no public policy and did not advance CPD's investigation into the death in any way. The lie was told recklessly, and with a complete disregard for the emotional impact it would cause Sarah.

80. Upon his arrival at the hospital, UC Medical records indicate that Patrick still had a pulse and lost that pulse while being transferred to the operating room.

81. Patrick bled to death alone on the operating room table. Patrick's time of death was noted by UC Physician Lane Frasier as 6:29 a.m.

82. UC staff contacted Patrick's parents to inform them that Patrick had died, but they were unable to tell Sarah. It wasn't until CPD finally decided to release her that they told Sarah the truth: her husband was dead.

83. The cause of death was ruled to be Patrick's stab wounds.

84. In the immediate aftermath of Patrick's death, Mayor Pureval made a number of public statements to the press. One of those statements was: "When [Black] cut his ankle monitor, City law enforcement should have been notified immediately, and he should have been tracked down and apprehended. That this didn't happen is unacceptable."[3]

---

[3]https://www.wlwt.com/article/patrick-heringer-wife-cincinnati-mayor-response-stabbing/65026255

85. This statement is the City's publicly stated policy, as outlined by its chief policymaker, Mayor Pureval: that individuals with parole violation warrants should be tracked down and apprehended. The truth, however, is that the City follows a custom and practice of under-policing, under-reporting, and under-investigating crime in the City. Thus, the City intentionally chooses not to act on crime so as to artificially deflate the City's crime statistics.

86. Moreover, this statement is a false. As noted above, an NCIC warrant was entered for Black's arrest, and was visible to Officers on each of the three times they interacted with Black between February and June of 2025. In each instance, the CPD officers responding chose the path that resulted in under-reporting Black's crimes and under-responding to the situation.

87. During a meeting with Sarah Heringer after Patrick's death, Police Chief Teresa Theetge told Sarah that the police had no idea that there was an arrest warrant for Black arising from the fact he cut off his ankle monitor. This statement cannot be true, as each interaction that the police had with Black would have revealed the outstanding NCIC warrant.

88. Chief Theetge's false statement is consistent with the City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City. Even after notice of Patrick's murder, Chief Theetge failed to note that there was an arrest warrant for Black. The City knowingly turned a blind eye to NCIC warrants and chose not to pursue outstanding warrants.

89. Sarah and Patrick's suffering is unimaginable and cannot be neatly summarized. Patrick was brutally murdered, Black attempted to rape Sarah. She will relive this tragedy every day for the rest of her life.

90. The economic harm suffered by Sarah is in excess of $75,000, exclusive of interest and costs.

91. The non-economic harm suffered by Sarah is in excess of $75,000, exclusive of interest and costs.

92. The economic harm suffered by Patrick and his estate is in excess of $75,000, exclusive of interest and costs.

93. The noneconomic harm suffered by Patrick and his Estate is in excess of $75,000, exclusive of interest and costs.

**COUNT I**
**WRONGFUL DEATH/TORTIOUS INJURIES/INDIVIDUAL DEFENDANTS**

94. Plaintiff incorporates the allegations in each of the preceding paragraphs as if fully rewritten herein.

95. For an individual-capacity federal claim under 42 U.S.C. § 1983, the plaintiff must prove a deprivation of a federal right caused by the officer acting under color of law and must defeat qualified immunity by showing a constitutional violation of a clearly established right and objectively unreasonable conduct.

96. The City of Cincinnati owes a duty to its citizens to exercise ordinary care in establishing, maintaining, and operating its police force. R.C. 737.11.

97. This includes establishing procedures for its police force and following those procedures.

98. The Estate and Sarah Heringer had an established right to expect the City to follow its own policies and procedures. As well, the individual defendants acted in an objectively unreasonable manner when they chose not to follow established policies, but instead to follow the unwritten customs and practices described in this Complaint.

99. In this matter, the officers named as defendants in their individual capacities failed at three critical junctures to follow police procedures. These failures, separately and together, deprived Patrick and Sarah of their constitutional rights.

100. As on duty officers, the individual defendants were each acting under color of law when they interacted with Black.

14

101. The officers failure to abide by City policies and procedures regarding its RMS prevented it from executing the multiple outstanding warrants for the arrest of Mordecia Black.

102. The City's failure to arrest Black on either April 6, 2025 or June 3, 2025 violated the City's written policies and applicable state law.

103. As a direct and proximate result of this objectively unreasonable conduct, Black was permitted to remain at large despite multiple warrants for his arrest.

104. The specific danger posed by allowing Black to remain at large, i.e. that he would commit a violent burglary, was therefore known to the Cincinnati Police Department.

105. Patrick Heringer's death was a foreseeable result of the individual defendants' failure to follow CPD's policies and procedures.

106. Patrick Heringer suffered severe emotional distress and conscious pain and suffering while being murdered by Black. As well, his estate has suffered economic damages arising from his lost ability to earn money.

107. Sarah suffered severe emotional distress and conscious pain and suffering while being assaulted by Black. As well, she suffered personal physical injuries and other injuries as a result of the defendants' actions.

## COUNT II
## WRONGFUL DEATH: MONELL LIABILITY UNDER § 1983

108. Plaintiff incorporates the allegations in each of the preceding paragraphs as if fully rewritten herein.

109. The Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law," U.S. Const. Amend. XIV, and the Fifth Amendment imposes the same constraint on federal action, U.S. Const. Amend. V.

110. A municipality may be held liable when execution of a government's custom or practice, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.

15

111. The City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City, as applied to Patrick Heringer, deprived Patrick of his rights to life and liberty.

112. The City's failure to follow its own written policies and procedures and instead follow its custom and practice of under-policing, under-reporting, and under-investigating crime in the City was the moving force behind Patrick's murder. In particular, had the CPD and individual officers followed applicable Ohio law and its own publicly stated policies, then Black would have been arrested before he murdered Patrick.

113. The fact that the City, on three different occasions and with different officers, failed to follow its own policies, but instead under-policed, under-reported, and under-investigated incidents concerning Black, indicates that the custom and practice was so persistent and widespread that policymakers had either actual or constructive notice of the policy. And that the City has failed with deliberate indifference to correct these policies. The consequences of these actions and failures to act has been the death of Patrick Heringer.

114. Patrick Heringer suffered severe emotional distress and conscious pain and suffering while being murdered by Black. As well, his estate has suffered economic damages arising from his lost ability to earn money.

## COUNT III
## ASSAULT/ATTEMPTED RAPE: MONELL LIABILITY UNDER § 1983

115. Plaintiff incorporates the allegations in each of the preceding paragraphs as if fully rewritten herein.

116. The Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law," U.S. Const. Amend. XIV, and the Fifth Amendment imposes the same constraint on federal action, U.S. Const. Amend. V.

117. A municipality may be held liable when execution of a government's custom or practice, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.

16

118. The City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City, as applied to Sarah Heringer, deprived Sarah of her rights to life and liberty, in particular the City's customs and practices caused her to be assaulted and nearly raped during her encounter with Black.

119. The City's failure to follow its own written policies and procedures and instead follow its custom and practice of under-policing, under-reporting, and under-investigating crime in the City was the moving force behind Sarah's injuries. In particular, had the CPD followed applicable Ohio law and its own publicly stated policies, then Black would have been arrested before he assaulted and attempted to rape Sarah.

120. The fact that the City, on three different occasions and with different officers, failed to follow its own policies, but instead under-policed, under-reported, and under-investigated incidents concerning Black, indicates that the custom and practice was so persistent and widespread that policymakers had either actual or constructive notice of the policy. And that the City has failed with deliberate indifference to correct these policies. The consequences of these actions and failures to act has been the assault and attempted rape of Sarah Heringer.

121. Sarah suffered severe emotional distress and conscious pain and suffering while being assaulted by Black. As well, she suffered personal physical injuries and other injuries as a result of the defendants' actions.

## COUNT IV
## WRONGFUL DEATH: FAILURE TO TRAIN

122. Plaintiff incorporates the allegations in each of the preceding paragraphs as if fully rewritten herein.

123. As outlined in the factual scenario, in just one circumstance with just two victims, the City's custom and practice of under-policing, under-reporting, and under-investigating crime in the City resulted in Patrick Heringer's death and an assault on Sarah Heringer.

17

124. This policy, however, is practiced throughout Cincinnati by CPD leadership. It is widely understood by CPD leaders that crimes are routinely downgraded and underreported.

125. Based upon this custom and practice, the CPD did not train its officers to enforce the law and follow procedures; instead, leadership permitted the custom and practice to continue. The fact that members of the CPD were not following written procedures was obvious and known to CPD leadership. This knowledge put the CPD on notice that its failures could lead to constitutional violations like the ones in this matter.

126. The City's failure to properly train and discipline its officers amounts to deliberate indifference to following its stated procedures and the resulting acquiescence to its custom and practice. This resulted in the death of Patrick Heringer and the injuries suffered by Sarah Heringer.

127. There are multiple prior instances illustrating this custom and practice. The City operates with far fewer officers than it actually needs. This fact fuels the custom and practice of under-policing, under-reporting, and under-investigating crime in the City. By reporting lower crime statistics than actually exist, the City can avoid debate over the manpower shortage it has never addressed.

128. The City is one of the highest crime cities in the United States, but its current leadership team has done little to address the deficiencies in the CPD. Instead, it hides and minimizes the true state of affairs through its customs and practices.

129. Patrick Heringer suffered severe emotional distress and conscious pain and suffering while being murdered by Black. As well, his estate has suffered economic damages arising from his lost ability to earn money.

130. Sarah suffered severe emotional distress and conscious pain and suffering while being assaulted by Black. As well, she suffered personal physical injuries and other injuries as a result of the defendants' actions.

## COUNT VI

## LOSS OF CONSORTIUM

131. Plaintiff incorporates the allegations in each of the preceding paragraphs as if fully rewritten herein.

132. As a result of the conduct described above, Sarah Heringer has suffered and will continue to suffer a loss of consortium, society, companionship, affection, and assistance from Patrick Heringer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sarah Heringer, in her individual capacity and as administrator of the estate of Patrick Heringer, demands judgment against Defendants as follows:

a. For a trial by jury;

b. For a judgment on all counts;

c. For an award of damages representing Sarah Heringer's loss of consortium, in an amount to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

d. For an award of damages representing Sarah Heringer's conscious pain and suffering and personal physical injuries, in an amount to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

e. For an award of damages representing Sarah Heringer's emotional distress, in an amount to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

f. For an award of damages representing Patrick Heringer's conscious pain and suffering and personal physical injuries, in an amount to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

g. For an award of damages representing Patrick Heringer's emotional distress, in an amount to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

19

h.  For an award of all damages as permitted under ORC §2125.02;

i.  For an award of compensatory damages owed to Sarah Heringer and the Estate of Patrick Heringer, to be determined by the trier of fact and in excess of $75,000, exclusive of interest and costs;

j.  For Plaintiffs' costs and attorneys' fees, including under 42 U.S.C. § 1988;

k.  For punitive damages; and

l.  For such other relief to which the Court deems Plaintiff entitled.

Respectfully submitted,

*/s/ Todd V. McMurtry*
Todd V. McMurtry (0069258)
THE MCMURTRY LAW FIRM, PLLC
405 Garrard Street
Suite 204
Covington, KY 41011
todd@mcmurtry-law.com
(859) 802-6292